UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| RICHARD GRIFFIN, | ) | No. CV 12-7292-PLA |
| Petitioner, | ) | |
| | ) | **MEMORANDUM DECISION AND ORDER** |
| v. | ) | **DISMISSING PETITION** |
| JAMES HEARTLEY, | ) | |
| Respondent. | ) | |
| _____ | ) | |

I.

**SUMMARY OF PROCEEDINGS**

On November 16, 2010, in the Los Angeles County Superior Court, petitioner pleaded no contest to first degree residential burglary (Cal. Penal Code § 459). (Lodged Documents ("Lodged Docs.") 1-2, 4 at 37-41). Petitioner also admitted that he had one prior strike within the meaning of California's Three Strikes Law (Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)),[1] and that he served a prison term within the meaning of California Penal Code section 667.5(b). (Lodged Docs.

---

[1]    California's Three Strikes Law prescribes increased terms of imprisonment for defendants who have previously been convicted of certain "violent" or "serious" felonies. See Cal. Penal Code §§ 667(a)(1), (d)(1).

2, 4 at 39-40).  Petitioner was sentenced to 9 years in state prison.  (Lodged Docs. 1-2, 4 at 42).
Petitioner did not file a direct appeal from his conviction.[2]

On August 25, 2011, petitioner filed a petition for writ of mandate in the California Court of
Appeal.  (Lodged Doc. 5).  The court of appeal denied that petition on September 20, 2011.
(Lodged Doc. 6).

Petitioner filed a habeas petition in the Los Angeles County Superior Court on or about
November 2, 2011.[3]  (Lodged Doc. 7).  On December 23, 2011, the superior court denied the
petition, concluding that petitioner had "failed to state any basis for relief."  (Lodged Doc. 8).

On December 19, 2011, petitioner filed a petition for writ of mandate in the California
Supreme Court, which was transferred to the California Court of Appeal on December 29, 2011.
(Lodged Docs. 9-10).  The court of appeal denied that petition on January 12, 2012.  (Lodged Doc.
11).

On January 25, 2012, petitioner filed a habeas petition in the court of appeal, which was
denied on February 6, 2012.  (Lodged Docs. 12-13).  Petitioner's habeas petition filed in the
California Supreme Court on March 22, 2012, was summarily denied on June 27, 2012.  (Lodged
Docs. 14-15).

On August 24, 2012, petitioner filed his Petition in this Court, and consented to have the
undersigned Magistrate Judge conduct all further proceedings in this matter.  On February 6,
2013, respondent filed an Answer, along with a Memorandum of Points and Authorities, and also
consented to have the undersigned Magistrate Judge conduct all further proceedings.  On March
7, 2013, petitioner filed a "Denial to [the] Answer" (the "Reply").

This matter has been taken under submission, and is ready for decision.

---

[2]    Petitioner states in the Petition that he filed a direct appeal, but in the place on the form
petition for petitioner to provide information about his direct appeal, he provides case numbers for
his state habeas petitions.  (Compare Petition at 2-3 with Lodged Docs. 13-15).

[3]    The copy of that habeas petition lodged with this Court reflects that the superior court
received it on November 2, 2011, but does not reflect what date the petition was filed.  (See
Lodged Doc. 7).

## II.

## **STATEMENT OF FACTS[4]**

Sandra Klein testified at petitioner's preliminary hearing that she lives at 2259 Coldwater Canyon in Los Angeles, California.  (Reporter's Transcript of Preliminary Hearing ("RT") at 4-5). She left home at approximately noon on January 8, 2010, leaving the den door at the rear of her house open to air out carpet that had been cleaned several days earlier.  (RT at 5-6, 9).  When she returned home at approximately 5:00 p.m., she saw "things ... sprawled all over" and "on the ground" in her bedroom, and also noticed that certain items were missing from the guest closet in the hall.  (RT at 6).  She later determined that some leather and suede coats, a black cashmere scarf, leather-lined cashmere gloves, a digital camera, a pillowcase, a tape measure, and some coupons had been taken.  (RT at 10-11).  Klein testified that no one had permission to enter her house or take anything.  (RT at 7).

Veronica Aragon testified that she is a neighbor of Klein's, and that she was leaving her home at approximately 2:30 p.m. on January 8, 2010.  (RT at 18, 20).  As she was pulling out of her driveway and looking to the left, where Klein's house was, she saw a man walk "speedily" from the area around the back gate of Klein's house (which led into Klein's backyard) down the driveway to a leopard-printed limousine that was parked in front of the house.  (RT at 20-22, 27). The man got into the limousine and drove away before Aragon finished pulling out of her driveway. (RT at 21).  Aragon testified that the closest she got to the man was approximately 25 feet, and that she did not see him carrying anything.  (RT at 37-38).  Later, she reported to the Los Angeles Police Department ("LAPD") that the man she saw was Caucasian.  (RT at 48-49).

LAPD Detective George Bowens testified that as part of his investigation of the burglary, he spoke with Marvin Miller, the owner of a limousine company in the Los Angeles area.  (RT at 41-42).  Miller told Detective Bowens that he owned a fleet of leopard-printed limousines, and that he had recently hired petitioner as a driver assigned to the West Los Angeles area.  (RT at 42). Miller also told the detective that petitioner was on duty on January 8, 2010, and that the only

---

[4]    As petitioner entered a no contest plea, the factual summary is based on the evidence adduced at petitioner's preliminary hearing.

1   other people working as drivers for Miller's leopard-printed limousines on that day were two

2   African-American men who were assigned to the Marina Del Rey area and the Hollywood area.

3   (RT at 43-44, 61).  Miller relayed that at approximately 2:00 p.m. on January 8, 2010, petitioner

4   had been passing out flyers at the Beverly Glen Plaza to advertise Miller's limousine business.

5   (RT at 43-44).  Detective Bowens testified that the Beverly Glen Plaza is less than four miles from

6   Klein's house.  (RT at 44, 49).

7       At some time after the burglary, Aragon spoke with Detective Bowens over the telephone

8   and described the man she had seen as "a slightly strange[-]looking David Bowie."  (RT at 30, 53).

9   Detective Bowens responded, "Oh, what a coincidence.  I'm looking at a strange[-]looking David

10  Bowie who has done plenty of burglaries."  (RT at 30).

11      On January 21, 2010, Detective Bowens and another officer went to Aragon's house to

12  have her view a six-pack photographic lineup that Detective Bowens had put together as part of

13  his investigation.  (RT at 22-23, 44, 49, 55).  Petitioner's photograph was in the fourth position in

14  the lineup.  (RT at 45).  When Detective Bowens showed Aragon the lineup, she immediately

15  eliminated the photographs numbered 1, 2, 3, and 5, and used her hands to cover those

16  photographs.  (RT at 23-24).  While she "had [her] finger on [photograph] 4," and was comparing

17  photograph 4 with photograph 6, she stated: "I'm pretty sure.  Give me a minute.  I just want to

18  make sure."  (RT at 23-24, 36).  Aragon testified that at that point, she was "about 95 [percent]

19  positive it was number 4."  (RT at 23).  While she was still trying to decide, Detective Bowens

20  "grabbed" a pen, circled photograph number 4, and said "something to the effect of, 'You're too

21  close, I can't let you.'"  (RT at 24).  The detective then asked Aragon to place her initials next to

22  the circle, which she did.  (RT at 24-25).  Aragon told the detective that the facial features of the

23  man in photograph number 4 most resembled the person she saw on January 8, 2010.  (RT at

24  25).  Aragon testified that before she made the identification, she had the impression that the

25  photospread contained someone the police believed had committed the burglary.  (RT at 30).  She

26  also testified that after she made the identification, the detectives told her: "Oh, this guy has a

27  record, and he's done this plenty of times."  (Id.).  At the preliminary hearing on March 22, 2010,

28

Aragon testified that she was approximately 50 percent certain that petitioner was the person she saw on January 8, 2010.  (RT at 39).

## III.

## PETITIONER'S CONTENTIONS

1.     Petitioner's due process rights were violated by an unduly suggestive photographic lineup.  (Petition at 5; Petition Attachment ("Petition Attach.") at 39-44; Reply at 6-7).

2.     Petitioner's trial counsel was ineffective because she: (a) did not file a motion to suppress the photographic lineup evidence; (b) failed to investigate and "present a defense" based on "exculpatory evidence"; (c) ill-advised petitioner to take a plea bargain; (d) failed to acquire petitioner's mental health records before allowing him to plead no contest; and (e) failed to address that petitioner was not "in a right state of mind" when he pleaded no contest.  (Petition at 5; Petition Attach. at 45-54; Reply at 7-10).

3.     Petitioner's Sixth Amendment and Fourteenth Amendment rights were violated because he was mentally incapacitated at his sentencing hearing.  (Petition at 5-6; Petition Attach. at 55-72; Reply at 10).

## IV.

## STANDARD OF REVIEW

The Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").  Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Therefore, the Court applies the AEDPA in its review of this action.  See Lindh v. Murphy, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

1  unreasonable determination of the facts in light of the evidence presented in the State court

2  proceeding."  28 U.S.C. § 2254(d).  As explained by the Supreme Court, section 2254(d)(1)

3  "places a new constraint on the power of a federal habeas court to grant a state prisoner's

4  application for a writ of habeas corpus with respect to claims adjudicated on the merits in state

5  court."  Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

6      "Under § 2254(d), a habeas court must determine what arguments or theories supported

7  ... the state court's decision; and then it must ask whether it is possible fairminded jurists could

8  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

9  [the Supreme Court]."  Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 786, 178 L.Ed.2d 624

10  (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so

11  long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").  In

12  Williams, the Court held that:

13      Under the "contrary to" clause, a federal habeas court may grant the
        writ if the state court arrives at a conclusion opposite to that reached

14      by this Court on a question of law or if the state court decides a case
        differently than this Court has on a set of materially indistinguishable

15      facts. Under the "unreasonable application" clause, a federal habeas
        court may grant the writ if the state court identifies the correct

16      governing legal principle from this Court's decisions but unreasonably
        applies that principle to the facts of the prisoner's case.

17

18  Williams, 529 U.S. at 412-13; see Weighall v. Middle, 215 F.3d 1058, 1061-62 (9th Cir. 2000)

19  (discussing Williams).  A federal court making the "unreasonable application" inquiry asks "whether

20  the state court's application of clearly established federal law was objectively unreasonable."

21  Williams, 529 U.S. at 409; Weighall, 215 F.3d at 1062.  The Williams Court explained that "a

22  federal habeas court may not issue the writ simply because that court concludes in its independent

23  judgment that the relevant state-court decision applied clearly established federal law erroneously

24  or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

25  accord: Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  Section

26  2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," Lindh, 521

27  U.S. at 333 n.7, and "demands that state court decisions be given the benefit of the doubt."

28

1   Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (per curiam).

2   Moreover, "[e]valuating whether [an] application [of a clearly established Federal legal rule] was

3   unreasonable requires considering the rule's specificity.  The more general the rule, the more

4   leeway [state] courts have in reaching outcomes in case-by-case determinations." Richter, 131

5   S.Ct. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938

6   (2004)).  A federal court may not "substitut[e] its own judgment for that of the state court, in

7   contravention of  28 U.S.C. § 2254(d)." Woodford, 537 U.S. at 25; Early v. Packer, 537 U.S. 3,

8   123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002) (per curiam) (holding that habeas relief is not proper

9   where state court decision was only "merely erroneous").

10         The only definitive source of clearly established federal law under the AEDPA is the

11   holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.

12   Williams, 529 U.S. at 412.  While circuit law may be "persuasive authority" for purposes of

13   determining whether a state court decision is an unreasonable application of Supreme Court law

14   (Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999)), only the Supreme Court's holdings

15   are binding on the state courts and only those holdings need be reasonably applied. Williams, 529

16   U.S. at 412; Moses v. Payne, 555 F.3d 742, 759 (9th Cir. 2009).  Furthermore, under 28 U.S.C.

17   § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the

18   petitioner rebuts the presumption "by clear and convincing evidence."

19         In Richter, the Supreme Court recently held that a state court's summary denial order will

20   be presumed to be a merits determination "in the absence of any indication or state-law procedural

21   principles to the contrary."  The Supreme Court also held that the AEDPA standard of review

22   applies to such summary denial orders:

23                    [D]etermining whether a state court's decision resulted from an
                 unreasonable legal or factual conclusion does not require that there
24                 be an opinion from the state court explaining the state court's
                 reasoning.  Where a state court's decision is unaccompanied by an
25                 explanation, the habeas petitioner's burden still must be met by
                 showing there was no reasonable basis for the state court to deny
26                 relief.  This is so whether or not the state court reveals which of the
                 elements in a multipart claim it found insufficient, for § 2254(d) applies
27                 when a "claim," not a component of one, has been adjudicated.

28   131 S.Ct. at 784 (citations omitted).

1    Here, petitioner raised all of the claims presented in the Petition in his habeas petitions filed

2    in the Los Angeles County Superior Court, the California Court of Appeal, and the California

3    Supreme Court.  The superior court denied petitioner's habeas petition, concluding that he had

4    "failed to state any basis for relief" (Lodged Doc. 8); the court of appeal summarily denied

5    petitioner's habeas petition filed in that court (Lodged Doc. 11); and the supreme court also

6    summarily denied his petition.  (Lodged Doc. 15).  In accordance with <u>Richter</u>, because no state

7    court issued a reasoned decision rejecting any of petitioner's claims, this Court must determine

8    what arguments or theories could have supported the rejection of petitioner's claims, and then

9    assess reasonableness by asking "whether it is possible fairminded jurists could disagree that

10   those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme

11   Court]."  <u>Richter</u>, 131 S.Ct. at 786.

12

13                                      **V.**

14                                **<u>DISCUSSION</u>**

15   **GROUND TWO (c):**        **COUNSEL ADVISED PETITIONER TO ACCEPT A PLEA BARGAIN**
16                             **WHEN SHE KNEW OF EVIDENCE THAT WOULD HAVE HELPED**
                               **HIM PREVAIL AT TRIAL**

17   **GROUND TWO (d):**        **COUNSEL FAILED TO ACQUIRE PETITIONER'S MENTAL**
18                             **HEALTH RECORDS BEFORE ALLOWING HIM TO ACCEPT A**
                               **PLEA BARGAIN**

19   **GROUND TWO (e):**        **COUNSEL FAILED TO ADDRESS THAT PETITIONER WAS NOT**
                               **IN THE "RIGHT STATE OF MIND" TO ACCEPT A PLEA BARGAIN**
20
     **GROUND THREE (a):**      **COUNSEL ALLOWED PETITIONER TO BE SENTENCED WHILE**
21                             **HE WAS MENTALLY INCAPACITATED**

22          Petitioner asserts that counsel was ineffective for: ill-advising petitioner to take a plea

23   bargain (Ground Two (c)); failing to acquire petitioner's mental health records before allowing him

24   to plead no contest (Ground Two (d)); failing to address that petitioner was not "in a right state of

25   mind" when he pleaded no contest (Ground Two (e)); and allowing him to be sentenced when he

26   was mentally incapacitated (Ground Three (a)).  (Petition at 5-6; Petition Attach. at 48, 50-59).

27   /

28   /

                                         8

### A.    Relevant Law

In federal habeas proceedings, the two-step analysis outlined by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs ineffective assistance claims.  See Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)) (holding the Strickland test applies to plea challenges based on ineffective assistance of counsel).  Under Strickland, petitioner first must prove that his attorney's representation fell below an objective standard of reasonableness by identifying the acts or omissions that rendered the representation objectively unreasonable.  Strickland, 466 U.S. at 687-88, 690.  An attorney's performance is deemed deficient if it is objectively unreasonable under prevailing professional norms.  Id. at 687 ("[A] guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not 'a reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys in criminal cases.'");  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990).   Review of counsel's performance is highly deferential, and the petitioner must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable representation.  Strickland, 466 U.S. at 689.  The habeas court need not determine the actual reason for an attorney's actions, as long as the act falls within the range of reasonable representation.  See Morris v. California, 966 F.2d 448, 456-57 (9th Cir. 1991).  In reviewing a challenge to the effectiveness of trial counsel, the court must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  Moreover, because "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks," this Court's limited role is to determine "whether there was manifest deficiency in light of information then available to counsel."  Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 741, 178 L.Ed.2d 649 (2011).

With respect to Strickland's second prong, petitioner must show prejudice by demonstrating a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to

1  undermine confidence in the outcome." Id.  With respect to pleas, the "prejudice" requirement

2  focuses on whether the complained of conduct affected the outcome of the plea process. Hill, 474

3  U.S. at 59.  In other words, petitioner must establish that "there is a reasonable probability that,

4  but for counsel's alleged errors, he would not have pleaded [no contest] and would have insisted

5  on going to trial." Id.; see also Doganiere v. United States, 914 F.2d 165, 168 (9th Cir. 1990).

6      Petitioner bears the burden of satisfying both prongs of the Strickland standard.  Strickland,

7  466 U.S. at 687; Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010).  Moreover, because

8  petitioner must prove both deficient performance and prejudice, a federal court "need not

9  determine whether counsel's performance was deficient before examining the prejudice suffered

10  by the defendant as a result of the alleged deficiencies. ... If it is easier to dispose of an

11  ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be

12  followed." Strickland, 466 U.S. at 697.

13      The Court further observes that a Strickland analysis pursuant to 28 U.S.C. § 2254(d) is

14  very deferential.  Premo, 131 S.Ct. at 740 ("The standards created by Strickland and § 2254(d)

15  are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so.  The

16  Strickland standard is a general one, so the range of reasonable applications is substantial.")

17  (citations omitted).  Thus, when section 2254(d) applies, as it does in this case, "the question is

18  not whether counsel's actions were reasonable.  The question is whether there is any reasonable

19  argument that counsel satisfied Strickland's deferential standard." Id. at 740.

20  **B.    Ground 2 (c): Counsel Advised Petitioner to Take Plea Bargain**

21      In this ineffective assistance of counsel claim, petitioner asserts that defense counsel ill-

22  advised him to waive his right to a jury trial and to accept a plea bargain,[5] "fully knowing and aware

23  that he had a 70% chance of introducing reasonable doubt in the minds of a jury at trial." (Petition

24  Attach. at 50).  In support, petitioner points to Exhibits A and D in the Petition -- Exhibit A is a

25  November 7, 2011, letter from defense counsel to petitioner acknowledging that counsel's notes

26  _____

27      [5]    The Court applies the same analysis to petitioner's claims that he was ill-advised to accept the
    plea bargain in spite of new evidence (Petition at 5; Petition Attach. at 11, 17), and that he was ill-

28  advised to waive his right to a jury trial in spite of new evidence (Petition Attach. at 50).

reflected that "Aragon had told [counsel] she was feeling less than 50% sure of her in court

identification [at petitioner's preliminary hearing], and maybe was only 30% sure now," and Exhibit

D is a copy of counsel's September 21, 2010, handwritten note stating: "Aragon now says she's

not even 50% sure ... of ID, she's more like 30%."  (Petition, Exs. A, D).

On November 16, 2010,[6] before petitioner entered his no contest plea, the trial court denied

petitioner's motion, filed under California Penal Code section 995, to dismiss the information.[7]

(Lodged Doc. 4 at 15-17, 19, 38).  Thereafter, the trial court and counsel discussed the most

recent plea bargain offers and counteroffers made by the parties:

| | | |
|---|---|---|
| Court: | I believe the prosecution's last offer was nine years? |
| [Prosecutor]: | The prosecution's last offer was 13 years.  I believe the counteroffer was nine. |
| [Defense Counsel]: | Well, their last offer was 11, quite honestly.  [Petitioner's] offer was nine.  That was back in September on the 24th. |
| Court: | All right.  It might be worth spending some time talking about these offers. ... |

(Id. at 19).  Defense counsel represented that she would talk to petitioner during lunch that day.

(Id.).

/

---

[6]   The reporter's transcript for this proceeding (the "section 995 motion hearing") states that it took place on November 8, 2010, but the transcript for this and surrounding proceedings reflect that the section 995 motion hearing actually took place on November 16, 2010.  The proceeding immediately prior to the section 995 motion hearing took place on November 8, 2010, and the end of the transcript for that proceeding states: "(The matter was continued to Tuesday, November 16, 2010, at 9:30 a.m. for further proceedings.)."  (Lodged Doc. 4 at 1, 14).  In addition, at the beginning of the section 995 motion hearing, the trial court noted that the motion was filed on November 8, 2010, and the prosecutor indicated that she had not filed a written response, "because we're inside the ten days' notice."  (Id. at 15).  Finally, at the close of the section 995 motion hearing, defense counsel stated that she would talk to petitioner about the plea bargain offers "during lunch today," and at the start of the next proceeding -- on the afternoon of November 16, 2010 -- the trial court stated, "We put this over this afternoon just so the parties can discuss settlements."  (Id. at 19-21).

[7]   As applicable in petitioner's case, section 995 allows an information to be set aside where "the defendant had been committed without reasonable or probable cause."  Cal. Penal Code § 995(a)(2)(B).

In court later that afternoon, the trial court stated to petitioner: "I understand that the People have reduced their offer from eleven years to ten, and you wanted nine, but you're not willing to do the ten; is that correct?" (Id. at 21). Petitioner responded that defense counsel -- and not he -- had been the original source of the counteroffer of nine years, stating: "these numbers are just being thrown out in the air." (Id. at 21-22). The following exchange ensued:

Court:          I don't want to argue with you, [petitioner], what was said or not said. The point is you're not willing to take ten?

[Petitioner]:   No.

Court:          Sounds like you're not willing to take nine?

[Petitioner]:   No, I will take nine.

Court:          All right. I just want before I proceed -- because today is the last day you're going to have these offers, so I just want to make sure that --

[Petitioner]:   Downstairs she asked me, "Would you take," and I said yes to end this.

Court:          I understand that. ... But the difficulty is the People are not willing to come down to nine. The Court -- there's no way the Court can get to nine legally, even if I were to allow you to plead open to the Court at this point. I can strike the priors on an open plea, but I can't strike the five-year priors. So the floor on an open plea is 17. I can't get there. ... So we can't get to any number lower than 17 without the People's agreement.

                The People are willing to come down to ten. You say you're willing to take nine. I want to point out to you the difference between a nine-year sentence and a ten-year sentence, in terms of your actual time at 15 percent credits, is an extra ten months in state prison. That's what we're talking about. If you go to trial and lose, the sentence you face, I'm sure [defense counsel] has explained this to you, is 40 years to life. That's the charge you face. I just want to make sure you understand all that before we proceed because as I said, today's the last day you're going to get this offer from the People.

                Do you understand all that?

[Petitioner]:   Uh-huh.

Court:          Is that a yes?

[Petitioner]:   Yes, I do understand it.

Court:          Okay. And do you want to take the deal or do you want to proceed?

| | | |
|---|---|---|
| [Petitioner]: | I want to fire my attorney. |
| Court: | That's not what I asked. |
| [Petitioner]: | Well, right now, trust me, I'm way far away from where I want to be. It's just -- let's see if we can get -- I'm done. I'm done because I'm being coerced. I'm being manipulated. I'm being whatever. I'm going to file the real motion. I -- I gave her the real motion. She didn't file the motion. The 995 motion in my file, she didn't give you. She gave you something else. I have both motions in my file. One's a 402, one is a 995 motion. She didn't give you the 995 motion. So she's not even going along -- |
| Court: | She did file a 995. |
| [Petitioner]: | No. She filed a completely different motion. I wrote a six-page motion, a 995 motion. A six-page motion. Was it submitted today? No, it wasn't. |

(Id. at 22-24). At that point, the trial court conducted a Marsden hearing.[8][9] (Id. at 24). It appears from the record that after the hearing, counsel continued in her capacity as petitioner's attorney. (See id. at 41).

Following the Marsden hearing, the trial court informed petitioner:

> [Petitioner], I understand that the People have now revised their offer down to nine years. And the terms of the offer are that you would admit one of the strikes, the conviction that is alleged, the most recent of the residential burglaries that occurred in Case SA023004 on November 14th, 1996. The People are going to move to strike the remaining strikes. They're going to move to strike all of the five-year prison priors, and they're going to move to strike all of the one-year prison priors that are alleged, except for the residential burglary from the 1996 conviction. That will be used as a one-year prior enhancement. So the term of the sentence would be mid-term of four years doubled under the Strikes law, plus the one-year enhancement for the total of nine. And you would be, as the Court understands it and as the People have represented, you would be entitled to 80 percent custody credits on that basis.

---

[8]   Under California law, a criminal defendant may make a motion to substitute counsel under People v. Marsden, 2 Cal.3d 118 (1970), on the basis that appointed counsel is providing inadequate representation. See People v. Smith, 30 Cal.4th 581, 604 (2003). Upon such a motion, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance." Id.

[9]   An earlier Marsden hearing was held on November 8, 2010. (See Lodged Doc. 4 at 5-6).

1   (Id. at 37).  The trial court asked petitioner: "Is that what you'd like to do this afternoon ... ?" to

2   which petitioner answered, "Yes, Your Honor." (Id.).  The trial court then reminded petitioner that

3   if he proceeded to trial, was convicted, and a jury found all the special allegations to be true, he

4   would face a minimum term of 40 years to life.  The court asked petitioner whether he understood

5   that and several other terms of the plea bargain, to which petitioner stated: "Yes, I do."  The court

6   also asked petitioner whether he understood that he had a right to a jury trial on the charges in the

7   information, to which petitioner answered: "Yes, I do." (Id. at 38).  The trial court then questioned

8   petitioner as follows:

9        Court:              Has anyone made any promises of any kind to you today, other
                             than the ones I just described to you on the record, in order to
10                           get you to change your plea this afternoon?

11       [Petitioner]:       No.

12       Court:              Has anyone made any threats of any kind today in order to get
                             you to change your plea this afternoon?
13
         [Petitioner]:       No.
14
         Court:              Are you entering into this plea agreement because you believe
15                           it's in your own best interest to do so?

16       [Petitioner]:       Yes, I do.

17   (Id. at 39).  Petitioner then pleaded no contest to the charge that he violated California Penal Code

18   section 459, charged as a felony.  (Id.).  The trial court found that petitioner had "knowingly,

19   intelligently and understandingly waive[d] [his] constitutional and statutory rights"; that "the no

20   contest plea [he had] entered [was] freely and voluntarily made"; "that he underst[oo]d the nature

21   and consequences of [his] plea"; and "that there[] [was] a factual basis for [his] plea." (Id. at 40-

22   41).  The court therefore accepted petitioner's no contest plea and, after petitioner waived time

23   for sentencing, the court in the same proceeding sentenced him to 9 years in state prison,

24   pursuant to the plea agreement.  (Id. at 41-42).

25        Following a careful review of the record, the Court finds that petitioner has failed to

26   establish either that defense counsel's representation fell below an objective standard of

27   reasonableness, or that there is a reasonable probability that, but for counsel's advice, petitioner

28

would not have pleaded no contest and would have insisted on going to trial.  See Strickland, 466 U.S. at 687; Hill, 474 U.S. at 58-59.

First, petitioner contends that counsel's advice to take the plea bargain constituted deficient performance because she was "fully ... aware that he had a 70% chance of introducing reasonable doubt in the minds of a jury at trial."  (Petition Attach. at 50).  Petitioner's argument overlooks the fact that, as he was advised by the trial court multiple times, if his case had proceeded to trial, he faced a potential minimum sentence of 40 years to life in light of the multiple alleged prior "strikes" within the meaning of California's Three Strikes Law, and the multiple alleged prison terms within the meaning of California Penal Code sections 667(a) and 667.5(b).  (See Lodged Doc. 4 at 37). It also overlooks the evidence that a leopard-printed limousine was seen leaving the scene, that petitioner was the only Caucasian working at that time for Miller's limousine company (which had a fleet of leopard-printed limousines), and that he was based in the area of Klein's house around the time of the burglary.  Under these circumstances, counsel's advisement to accept a nine-year sentence in exchange for petitioner's plea did not amount to deficient performance.  See Salazar v. McEwen, 2012 WL 5381547, at *9 (C.D. Cal. Oct. 11, 2012) (counsel's advice to plead no contest to murder for a 29-year sentence was not objectively unreasonable or outside the range of competent performance where the petitioner's maximum exposure at trial was life imprisonment); Williams v. Salazar, 2011 WL 7069550, at *5 (C.D. Cal. Nov. 30, 2011) (counsel's advice to plead no contest in exchange for a five-year sentence was not deficient performance where, had the petitioner been convicted, he would have received his third strike and faced a maximum sentence of 29 years to life under California's Three Strikes Law); Traylor v. Ollison, 2009 WL 4623908, at **5-7 (C.D. Cal. Dec. 2, 2009) (not deficient performance where counsel advised the petitioner to plead no contest to 3 counts in the complaint for a total sentence of 20 years where he faced a potential life sentence under the entire 17-count complaint); Maldonado v. Woodford, 2008 WL 2413968, at *6 & n.3 (C.D. Cal. June 13, 2008) (counsel's strategic actions, which resulted in the petitioner's guilty plea in exchange for a sentence of 25 years to life, reduced from the statutory maximum of 50 years to life, was reasonable under the circumstances).

1    Petitioner also fails to establish a reasonable probability that, but for counsel's advice,

2   petitioner would not have pleaded no contest and would have insisted on going to trial. See Hill,

3   474 U.S. at 58-59. First, he points to the following statement he made prior to the November 16,

4   2010, Marsden hearing to assert that counsel coerced him into accepting the plea bargain: "I'm

5   done. I'm done because I'm being coerced. I'm being manipulated." (Petition Attach. at 14-15

6   & Ex. E; see Lodged Doc. 4 at 23). Both the context of those statements and the transcript of

7   petitioner's no contest plea belie his assertion, however. Petitioner's statements about being

8   "coerced" and "manipulated" were made in the context of his expression of dissatisfaction with

9   counsel's filing of a section 995 motion that differed from the section 995 motion he provided to

10   counsel, and with the fact that he was not being offered a nine-year sentence under the terms of

11   the plea bargain. Those statements did not assert that counsel, or anyone else, was coercing or

12   manipulating petitioner into pleading no contest. Moreover, when the trial court later that same

13   day asked petitioner whether anyone had made any promises of any kind to him on that day (other

14   than the ones set forth by the trial court as being part of his plea bargain), or made any threats of

15   any kind on that date to get him to plead no contest, petitioner answered, "No." (Lodged Doc. 4

16   at 39). A defendant's representations at a plea hearing, as well as any findings made by the judge

17   accepting the plea, constitute a "formidable barrier in any subsequent collateral proceedings."

18   Blackledge v. Perry, 417 U.S. 21, 73-74, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); see also Muth v.

19   Fondren, 676 F.3d 815, 821 (9th Cir. 2012) (quoting id.). Accordingly, petitioner's conclusory

20   allegation that he was coerced into pleading no contest is insufficient to overcome his own

21   November 16, 2010, representation that no one made him any threats or promises to get him to

22   plead no contest, and the trial court's finding that he entered into the plea "freely and voluntarily."

23   See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (rejecting an ineffective assistance of counsel

24   claim on the ground that "[c]onclusory allegations which are not supported by a statement of

25   specific facts do not warrant habeas relief").

26    Further, there are additional indications in the record that petitioner's decision to plead no

27   contest was an informed and independent choice on petitioner's part. On November 16, 2010,

28   after counsel had spoken over lunch with petitioner about the prosecutor's then-offer of a 10-year

1   sentence, petitioner represented to the trial court that he was not willing to accept a 10-year

2   sentence, but was willing to accept a 9-year sentence.  (Lodged Doc. 4 at 21-22).  Petitioner

3   explained that: "Downstairs [counsel] asked me, 'Would you take,' and I said yes **to end this**."

4   (Id. at 22) (emphasis added).  Thus, it appears that petitioner "had his own reasons for pleading

5   [no contest] wholly aside from" the risk involved in going to trial.  See Weaver v. Palmateer, 455

6   F.3d 958, 967 (9th Cir. 2006) (internal quotations and citation omitted).  Second, the record

7   reflects that petitioner himself bargained for and accepted the nine-year prison term in exchange

8   for his no contest plea.  After the colloquy during which petitioner represented that he would

9   accept a nine-year sentence if it were offered, and the Marsden hearing that followed, the trial

10  court informed petitioner that "the People ha[d] ... revised their offer down to nine years."  The trial

11  court asked petitioner whether he would accept the offer, and petitioner responded, "Yes, Your

12  Honor."  (Lodged Doc. 4 at 37).  Petitioner then entered his plea of no contest.  (Id. at 39).  Based

13  on this sequence of events, petitioner has not demonstrated that but for counsel's advice, he

14  would not have pleaded no contest.  Rather, petitioner's own bargaining for the nine-year term

15  reflects that he had his own reasons for being willing to take a nine-year sentence that were

16  different from or beyond counsel's reasons for advising petitioner to take any previous offers.

17  Finally, while petitioner now asserts that accepting the plea bargain was not in his best interest

18  (Petition Attach. at 48), when the trial court asked petitioner at his plea hearing: "Are you entering

19  into this plea agreement because you believe it's in your own best interest to do so?" petitioner

20  answered, "Yes, I do."  (Lodged Doc. 4 at 39).  "Solemn declarations in open court carry a strong

21  presumption of verity" (Blackledge, 431 U.S. at 74), and petitioner's conclusory, after-the-fact

22  allegations cannot overcome the presumption that his statements to the trial court were true.

23          Finally, petitioner does not assert that he was not aware of Aragon's September 21, 2010,

24  statement at the time he pleaded no contest.  Petitioner was certainly aware of Aragon's testimony

25  at his preliminary hearing that she was then only 50 percent sure that petitioner was the man she

26  saw on January 8, 2010.  As such, there is no evidence before the Court that petitioner did not

27  have all the same information that counsel had at the time of his plea.  Petitioner therefore was

28  free to reject counsel's advice on the same basis he now contends that her advice amounted to

deficient representation -- his belief that Aragon's September 21, 2010, statement constituted "exculpatory" evidence in his favor.  Accordingly, petitioner has not, by virtue of this statement, established a reasonable probability that but for counsel's advice, he would not have pleaded no contest and would have insisted on going to trial.

Petitioner fails to establish in this effective assistance of counsel claim either deficient representation or prejudice within the meaning of Strickland and Hill.  Accordingly, petitioner has not met his burden of showing that there was no reasonable basis for the California Supreme Court to deny this claim.  See Richter, 131 S.Ct. at 786.  Habeas relief is not warranted for Ground Two (c).

C.     Grounds 2 (d) and 2 (e): Counsel Failed to Acquire Petitioner's Mental Health Records and Failed to Address That He Was Not in a "Right State of Mind" to Plead No Contest

In Grounds Two (d) and Two (e), petitioner contends that counsel rendered ineffective assistance because she failed to acquire petitioner's mental health records before allowing him to plead no contest, and failed "to address" that petitioner was not "in a right state of mind" when he pleaded no contest because he was not on any mental health medication.  (Petition at 5-6; Petition Attach. at 48, 50-59).

"Competence is defined as the ability to understand the proceedings and to assist counsel in preparing a defense."  United States v. Howard, 381 F.3d 873, 878 (9th Cir. 2004) (internal citations omitted).  "When analyzing competence to plead guilty, [the Court] look[s] to whether a defendant has the ability to make a reasoned choice among the alternatives presented to him."  Id.  The Ninth Circuit has held that "[t]rial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."  Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir. 2003).  In other words, "[w]hen counsel has reason to question his client's competence to plead guilty, failure to investigate further may constitute ineffective assistance of counsel."  Howard, 381 F.3d at 881.

Here, petitioner attaches to the Petition medical records he asserts demonstrate that he had "a pre-existing diagnosed mental illness" at the time of his plea and sentencing.  (Petition Attach. at 55, 62-73).  In particular, a February 21, 2008, mental health evaluation reflects

diagnoses of bipolar disorder, psychotic disorder, and polysubstance abuse; and the opinions that petitioner's mood was "[g]randiose" and that he then had moderate to severe impairments in behavioral control. (Petition Attach. at 63, 65, 70). A February 27, 2008, mental health treatment plan reflects the same diagnoses, and a February 17, 2009, mental health treatment plan reflects a diagnosis of bipolar disorder. (Petition Attach. at 69, 72). Finally, two mental health records post-dating petitioner's conviction -- dated January 21, 2011, and March 22, 2011, respectively -- also reflect diagnoses of bipolar disorder. (Petition Attach. at 68, 71).

Petitioner asserts that these records demonstrate that he had "a pre-existing diagnosed mental illness" at the time of his November 16, 2010, plea and sentencing. (Petition Attach. at 55). He also asserts that counsel's failure to secure the records that existed as of that date resulted in none of his mental health records being "reviewed at any time by the court or a court-appointed clinician." (Petition Attach. at 52, 57). Petitioner further contends that counsel failed to secure medical attention for him, and that he "was not afforded the opportunity to have a mental evaluation made to determine the extent of his mental illness before being allowed to waive his right to a jury trial." (Petition Attach. at 52, 55). As a result, petitioner argues, he was suffering from an incapacitated mental condition during his plea without the benefit of any medications that might have stabilized his condition. (Petition Attach. at 51-52, 55).

Despite the evidence petitioner presents of his "pre-existing diagnosed mental illness," he has not established that counsel was *aware* of this evidence, or of any mental health problems on petitioner's part, prior to the entry of his no contest plea. Petitioner does not assert in the Petition and Reply that he told counsel about these problems, or that she had received notice of these problems from any other source. Neither has petitioner explained how counsel would have, on her own, become aware of his mental health problems or the documents concerning them. Indeed, the transcript of petitioner's plea and sentencing hearing provides a "strong counterweight to [p]etitioner's allegations regarding his mental state at the time." See Workman v. Blades, 2013 WL 211082, at *8 (D. Idaho Jan. 18, 2013) (transcript of the petitioner's plea proceeding provided a "strong counterweight" to his contention that trial counsel provided deficient representation by failing to prevent him from pleading guilty in his confused state of mind). Before petitioner's plea

hearing, and during the first afternoon proceeding on the same day, petitioner gave lucid responses to the trial court's questions, expressing that he would not take ten years but would take nine, and articulating reasons for his dissatisfaction with counsel. (See Lodged Doc. 4 at 21-24). At the plea hearing, petitioner also responded to the trial court's questions with logical and coherent answers, stating, "Yes, I do" in response to many questions, and stating, in response to being asked whether he admitted a prior strike: "Yes.  I admit that as well."  (See id. at 38-40). The trial court's finding, based on petitioner's statements and demeanor, that he had "knowingly, intelligently and understandingly waive[d] his constitutional and statutory rights," and "freely and voluntarily" entered into the no contest plea (id. at 41), constitutes a "formidable barrier" to petitioner's allegation that he was "not in a right state of mind" when he pleaded no contest.  See Blackledge, 431 U.S. at 73-74.  Accordingly, petitioner has not presented any evidence that a reasonable attorney in counsel's position would have had any doubts about petitioner's mental fitness to make a reasoned choice among the alternatives presented to him.  See Howard, 381 F.3d at 878; see also Workman, 2013 WL 211082, at *8 (where the petitioner only vaguely asserted that counsel was aware he was taking psychotropic medications, he failed to establish that counsel rendered deficient performance by allowing him to plead guilty in light of his mental state because the plea hearing transcript reflected that he provided logical and coherent answers that tracked the trial court's questions, and he had represented in court that his medications did not affect his ability to know what was going on); Von Holten v. Schriro, 2006 WL 3408286, at **16-20 (D. Ariz. Nov. 22, 2006) (where there was no evidence that counsel was aware of the petitioner's allegedly incapacitating head injury, he failed to establish that counsel had sufficient notice that he was incapacitated at the time of his plea and sentencing; neither his alleged difficulty in understanding counsel nor his reliance on counsel at the hearing was so rare to the attorney-client relationship as to supply notice of any diminished mental capacity).  Nor has he shown that his condition, even if known to counsel, rendered his plea not knowing and intelligent.

As petitioner has not established deficient representation in these claims, he has not met his burden of showing that there was no reasonable basis for the California Supreme Court to

1   deny these claims.  See Richter, 131 S.Ct. at 786.  Habeas relief is not warranted for Grounds

2   Two (d) and Two (e).

3       **D.**    **Ground 3 (a): Counsel Allowed Petitioner to Be Sentenced Even Though He
              Was Mentally Incapacitated**

4

5       In Ground Three (a), petitioner contends that counsel rendered ineffective assistance

6   because she allowed him to be sentenced even though he was mentally incapacitated.  (Petition

7   at 5-6; Petition Attach. at 48, 55, 59).  Respondent contends that this claim is barred by Teague

8   v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); that the AEDPA precludes relief

9   on this claim; and that this claim fails on the merits.  (Answer at 12-18).

10       The Teague rule is a "nonretroactivity principle" that "prevents a federal court from granting

11   habeas corpus relief to a state prisoner based on a [new] rule announced after his conviction and

12   sentence became final."  Caspari v. Bohlen, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236

13   (1994) (emphasis omitted).  "[A] case announces a new rule when it breaks new ground or

14   imposes a new obligation on the States or the Federal Government" or "if the result was not

15   dictated by precedent existing at the time the defendant's conviction became final."  Teague, 489

16   U.S. at 301 (emphasis in original).  As petitioner did not file a direct appeal from his conviction in

17   this case, for AEDPA purposes, his conviction became final on January 18, 2011, when the sixty-

18   day period for filing a notice of appeal expired.  See former Cal. Rules of Court, Rule 8.308.[10]

19       In Cooper-Smith v. Palmateer, 397 F.3d 1236 (9th Cir. 2005), the Ninth Circuit stated that

20   the Strickland Court "expressly declined to 'consider the role of counsel in an ordinary sentencing,

21   which ... may require a different approach to the definition of constitutionally effective assistance.'"

22   Id. at 1244 (quoting Strickland, 466 U.S. at 686); see Davis v. Grigas, 443 F.3d 1155, 1158 (9th

23   Cir. 2006) (quoting Cooper-Smith, 397 F.3d at 1244).  The Cooper-Smith Court also found that

24   "[s]ince Strickland, the Supreme Court has not decided what standard should apply to ineffective

25

26        [10]  Sixty days from November 16, 2010 (the date of petitioner's plea), was January 15, 2011 --
    a Saturday -- and January 17, 2011, was a holiday in California.  See Cal. Code Civ. Pro. §§ 12a,

27   135 (when the last day of a period falls on a Saturday, Sunday, or holiday, the expiration date
    becomes the next court day); Cal. Gov. Code § 6700 (the third Monday in January, known as "Dr.

28   Martin Luther King, Jr. Day," is a holiday).

1   assistance of counsel claims in the noncapital sentencing context." Cooper-Smith, 397 F.3d at

2   1244; see Davis, 443 F.3d at 1158.  The Ninth Circuit has therefore held that "there is no clearly

3   established federal law as determined by the Supreme Court in this context." Davis, 443 F.3d at

4   1158 (citing Cooper-Smith, 397 F.3d at 1244).  Thus, the rule implicitly urged by petitioner -- that

5   the right of a criminal defendant to receive the effective assistance of counsel includes such

6   assistance at a noncapital sentencing hearing -- was not compelled by existing precedent when

7   his conviction became final.[11]  Granting relief due to the alleged ineffective assistance of counsel

8   at petitioner's sentencing would therefore require the Court to apply a new rule of law, which would

9   preclude habeas relief in petitioner's case according to the Supreme Court's ruling in Teague.

10       In addition, neither of the exceptions to the Teague rule apply here.  Under the first

11  exception, "a new rule should be applied retroactively if it places certain kinds of primary, private

12  individual conduct beyond the power of the criminal law-making authority to proscribe." Teague,

13  489 U.S. at 307 (internal quotations and citation omitted).  This exception is inapplicable in this

14  case, since the rule petitioner urges that the Court adopt would not place any conduct beyond the

15  reach of criminal law or decriminalize a class of conduct. See Saffle v. Parks, 494 U.S. 484, 494-

16  95, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

17       Teague's second exception is for "'watershed rules of criminal procedure' implicating the

18  fundamental fairness and accuracy of the criminal proceeding." Id. at 495 (quoting Teague, 489

19  U.S. at 311).  The Supreme Court has observed that "[a]lthough the precise contours of this

20  exception may be difficult to discern, [the Court has] usually cited Gideon v. Wainwright, 372 U.S.

21

22  _____

23      [11]   Recently, in a case addressing ineffective assistance in the plea bargain context, the
    Supreme Court clarified that its "precedents ... establish that there exists a right to counsel during
24  sentencing in both noncapital, and capital cases.  Even though sentencing does not concern the
    defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can
25  result in Strickland prejudice because any amount of additional jail time has Sixth Amendment
    significance."  Lafler v. Cooper, __ U.S. __, 132 S.Ct. 1376, 1385-86, 182 L.Ed.2d 398 (2012)
26  (brackets, quotations, and citations omitted).  Because Lafler was not issued until 2012, well after
    petitioner's conviction became final, however, it cannot retroactively apply to petitioner.  See Daire
27  v. Lattimore, 2012 WL 1197645, at *3 (C.D. Cal. Apr. 9, 2012) (post-Lafler, district court is
    nevertheless bound by Cooper-Smith and Davis with respect to claim of ineffective assistance at
28  sentencing); see also discussion infra.

335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), holding that a defendant has the right to be represented by counsel in all criminal trials for serious offenses, to illustrate the type of rule coming within the exception." Saffle, 494 U.S. at 495.  Thus, this exception is also inapplicable here, as it cannot be said that the new rule urged by petitioner falls within the "small core of rules requiring 'observance of those procedures that ... are implicit in the concept of ordered liberty.'" Graham v. Collins, 506 U.S. 461, 478, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (quoting Teague, 489 U.S. at 311 (internal quotations and citation omitted)).

Relying on the Ninth Circuit's decisions in Davis and Cooper-Smith, respondent further contends that petitioner's Ground Three (a) also fails to present a cognizable habeas claim because those decisions established that: the Supreme Court has not decided what standard should apply to ineffective assistance of counsel claims in the noncapital sentencing context; there is no clearly established federal law that Strickland applies to such claims, although other courts are free to adopt the Strickland standard; and this Court cannot grant habeas relief on this claim. (Answer at 15-16 (citing Davis, 443 F.3d at 1158; Cooper-Smith, 397 F.3d at 1244)).

Regardless of whether respondent is correct that Strickland does not govern petitioner's claim in Ground Three (a),[12] or even if the second Teague exception applies, this Court finds that the California Supreme Court did not unreasonably apply Strickland when it rejected this claim. The Ninth Circuit has "repeatedly held that counsel may render ineffective assistance if [she] is on notice that [her] client may be mentally impaired, yet fails to investigate [her] client's mental condition as a mitigating factor in a penalty phase hearing." Correll v. Ryan, 539 F.3d 938, 950 n.3 (9th Cir. 2008) (quoting Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002) (internal quotations omitted)).  As discussed supra, petitioner has not presented any evidence that counsel was on notice that he had any mental health problems at the time of his plea and sentencing hearing.

---

[12]    As noted supra, the Supreme Court recently clarified in Lafler v. Cooper, 132 S.Ct. 1376, that its "precedents ... establish that there exists a right to counsel during sentencing in both noncapital, and capital cases." Id. at 1385-86.  The Lafler decision was issued on March 21, 2012 -- after petitioner's conviction became final on January 18, 2011, but before the California Supreme Court denied petitioner's habeas petition on June 27, 2012.

23

1    Accordingly, even if this ineffective assistance claim presents a cognizable federal habeas

2    claim, it would fail on the merits, and granting relief on the claim would contravene Teague.

3    Petitioner has not met his burden of showing that there was no reasonable basis for the California

4    Supreme Court to deny this claim.  See Richter, 131 S.Ct. at 786.  Habeas relief is not warranted

5    for Ground Three (a).

6

7    **GROUND ONE:**              **THE PHOTOGRAPHIC LINEUP WAS UNDULY SUGGESTIVE**

8    **GROUND TWO (a):**          **COUNSEL FAILED TO CONTEST THE TAINTED PHOTOGRAPHIC
                                  EVIDENCE**

9
10   **GROUND TWO (b):**          **COUNSEL FAILED TO FULLY INVESTIGATE AND "PRESENT A
                                  DEFENSE" BASED ON NEW EXCULPATORY EVIDENCE**

11   "As a general rule, one who voluntarily and intelligently pleads guilty to a criminal charge

12   may not subsequently seek federal habeas relief on the basis of pre-plea constitutional violations."

13   Mitchell v. Superior Court, 632 F.2d 767, 769 (9th Cir. 1980).  As stated by the Supreme Court:

14              [A] guilty plea represents a break in the chain of events which has
                preceded it in the criminal process.  When a criminal defendant has
15              solemnly admitted in open court that he is in fact guilty of the offense
                with which he is charged, he may not thereafter raise independent
16              claims relating to the deprivation of constitutional rights that occurred
                prior to the entry of the guilty plea.  He may only attack the voluntary
17              and intelligent character of the guilty plea by showing that the advice
                he received from counsel was not within the standards [of competent
18              counsel].

19   Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).  This principle

20   applies equally to defendants who plead no contest.  Ortberg v. Moody, 961 F.2d 135, 137-38 (9th

21   Cir. 1992).[13]

22   Since Tollett, the United States Supreme Court has recognized that the bar on attacking

23   pre-plea constitutional errors does not apply when the defect in question is a "jurisdictional" one

24   that implicates the government's power to prosecute the defendant.  United States v. Johnston,

25

26   _____
       [13]   In California, a no contest, or nolo contendere, plea to a felony charge is "considered the
27   same as a plea of guilty" and has the same legal effect as a guilty plea "for all purposes."  Cal.
     Penal Code § 1016; see also Jennings v. Mukasey, 511 F.3d 894, 896 n.1 (9th Cir. 2007) (citing
28   id.).

                                                24

1   199 F.3d 1015, 1019 n.3 (9th Cir. 1999) ("The Court has subsequently limited the scope of those

2   exceptions to include only those claims in which, judged on the face of the indictment and record,

3   the charge in question is one which the state may not constitutionally prosecute.") (citing United

4   States v. Broce, 488 U.S. 563, 574-76, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989)).  In other words,

5   "a guilty plea [is] not a bar to federal habeas corpus where the underlying constitutional claim goes

6   to the power of the state to bring the defendant into court to answer the charges brought against

7   him."  Journigan v. Duffy, 552 F.2d 283, 288 (9th Cir. 1977) (citing Blackledge, 417 U.S. at 30);

8   see also Menna v. New York, 423 U.S. 61, 62, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (holding that

9   the bar on collateral challenges to pre-plea errors did not apply to a claim that the indictment under

10   which a defendant pleaded guilty placed him in double jeopardy); Blackledge, 417 U.S. at 30-31

11   (holding that a guilty plea did not foreclose a claim that a defendant was vindictively prosecuted).

12        Petitioner asserts in Ground One that his due process rights were violated by the

13   photographic lineup because it was unduly suggestive; in Ground Two (a) that defense counsel

14   rendered ineffective assistance by failing to file a motion to suppress the photographic evidence;

15   and in Ground Two (b) that counsel was ineffective because she failed to fully investigate and

16   "present a defense" based on Aragon's September 21, 2010, statement.  (Petition at 5; Petition

17   Attach. at 11-18, 39-50).  With respect to Ground Two (b), petitioner contends that at a court

18   proceeding on September 23, 2010, counsel failed to inform the prosecutor of that statement by

19   Aragon -- which "would [have made] it impossible for the [prosecutor] to prove the case beyond

20   [a] reasonable doubt, [and thus] would [have] stop[ped] this case in its tracks" (Petition Attach. at

21   15) -- but instead disclosed other recently-discovered evidence to the prosecutor.  (Petition Attach.

22   at 15-16 & Ex. D).  On or around September 23, 2010, the prosecutor dismissed and refiled the

23   case[14] (see Petition Attach. at 16; Reply at 1), after which petitioner represented to counsel that

24

25

26       [14]   Any transcripts directly reflecting that petitioner's case was dismissed and refiled were not
     lodged with the Court, but the reporter's transcript for a November 8, 2010, proceeding reflects
27   the following statement made by defense counsel: "I filed a motion just before we were going --
     we were about to start the trial before they dismissed the case about this very issue ... ."  (Lodged
28   Doc. 4 at 5).

1   he wanted "another preliminary hearing so that [Aragon] can take the stand and tell the court she

2   is actually only 30% sure of her identification ... ."  (Petition Attach. at 16).

3        As discussed supra in Ground Two (c), petitioner has not demonstrated that his plea was

4   not entered into voluntarily and intelligently.  Further, no "jurisdictional" exception to the Tollett rule

5   applies here, as petitioner's claims related to the photographic lineup and the alleged failure of

6   counsel to challenge that evidence and "present a defense" based on Aragon's September 21,

7   2010, statement do not concern the power of the state to prosecute him.  Thus, petitioner's no

8   contest plea precludes federal habeas relief based on the alleged pre-plea errors in Grounds One,

9   Two (a), and Two (b).  See Tollett, 411 U.S. at 267; see also Delgado v. Felker, 2009 WL

10  3448245, at *5 (C.D. Cal. Oct. 26, 2009) (under Tollett, no contest plea barred habeas

11  consideration of the claim that defense counsel provided ineffective assistance by failing to move

12  to exclude a gang expert's testimony at the preliminary hearing and to present evidence to rebut

13  such testimony); Hardison v. Newland, 2003 WL 23025432, at *15 (N.D. Cal. Dec. 17, 2003)

14  (claim that counsel was ineffective, because he failed to move to suppress a photo identification

15  and results of a voice line-up, was held to be an independent, pre-plea claim that was waived by

16  petitioner's guilty plea and barred by Tollett).

17

18  **GROUND THREE (b):        PETITIONER'S MENTAL INCAPACITATION AT HIS SENTENCING**

19  **                                         HEARING VIOLATED HIS DUE PROCESS RIGHTS**

20       In Ground Three (b), petitioner contends his Fourteenth Amendment rights were violated

21  because he was mentally incapacitated at his sentencing hearing.  (Petition at 5-6; Reply at 10).

22       "[T]he level of competency mandated by due process does not vary based on the specific

23  stage of the criminal proceeding," but "the defendant's ability to participate or assist his counsel

24  must be evaluated in light of the type of participation required."  United States v. Dreyer, 705 F.3d

25  951, 961 (9th Cir. 2013) (citing Godinez v. Moran, 509 U.S. 389, 400-01, 113 S.Ct. 2680, 125

26  L.Ed.2d 321 (1993)).  The test for competency at a sentencing hearing is "'whether the defendant

27  is able to understand the nature of the proceedings and participate intelligently to the extent

28

1  participation is called for.'"  Dreyer, 705 F.3d at 961 (quoting Chavez v. United States, 656 F.2d

2  512, 518 (9th Cir. 1981)).

3       As discussed supra in Grounds Two (d) and Two (e), petitioner's plea and sentencing

4  proceeding did not at any point reflect that he was mentally incompetent.  Neither does petitioner

5  assert that he ever informed the trial court of his mental health history or ever requested that a

6  mental evaluation be performed, or that any mental issue prevented him from doing so.  Further,

7  the Court notes that after the trial court accepted petitioner's no contest plea, the prosecutor asked

8  the court whether it had "advise[d] [petitioner of] his right to a jury trial and to testify on his own

9  behalf and all that?"  Petitioner immediately stated: "At the beginning" (Lodged Doc. 4 at 41), as

10  the court indeed had advised him of the rights he would be waiving by accepting the plea bargain

11  just before he entered his plea.  (See id. at 38-41).  For these reasons, the record does not

12  provide any basis upon which it can be found that petitioner was not "able to understand the

13  nature of the proceedings and participate intelligently to the extent participation is called for" during

14  his sentencing.  Dreyer, 705 F.3d at 961.  Petitioner's conclusory assertion otherwise is not

15  sufficient to establish a violation of due process.  United States v. Smith, 924 F.2d 889, 896 (9th

16  Cir. 1991) ("unsupported and conclusory claims are not sufficient to show error").

17       Accordingly, petitioner has not met his burden of showing that there was no reasonable

18  basis for the California Supreme Court to deny this claim.  See Richter, 131 S.Ct. at 786.  Habeas

19  relief is not warranted for Ground Three (b).

20

21  **CERTIFICATE OF APPEALABILITY**

22       Under Rule 11(a) of the Rules Governing § 2254 Cases, a court must grant or deny a

23  certificate of appealability ("COA") when it denies a state habeas petition.  See also 28 U.S.C. §

24  2253(c).

25       A petitioner may not appeal a final order in a federal habeas corpus proceeding without

26  first obtaining a COA.  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A COA may issue "only

27  if ... [there is] a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

28  A "substantial showing ... includes showing that reasonable jurists could debate whether (or, for

that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (citation omitted); see also Sassounian v. Roe, 230 F.3d 1097, 1101 (9th Cir. 2000).  Thus, "[w]here a district court has rejected the constitutional claims on the merits, ... [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.

The Court concludes that, for the reasons set out above, jurists of reason would not find the Court's assessment of petitioner's claims debatable or wrong.  Accordingly, a certificate of appealability is **denied**.  Petitioner is advised that he may not appeal the denial of a COA, but he may ask the Ninth Circuit Court of Appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

## VI.

## ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Judgment is entered denying and dismissing the Petition with prejudice.  A certificate of appealability is also denied.

DATED: May 22, 2013

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE